**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.: 1:09-CR-40-TS |
| | ) | |
| DELMAS SEXTON | ) | |

**OPINION AND ORDER**

Before the Court is a Motion to Dismiss Indictment [DE 52], filed on February 5, 2010. The Defendant, Delmas Sexton, asks the Court to dismiss the Indictment in his case due to four lies that a witness, Jonathan Feldman, told to the grand jury. The Defendant argues that material parts of Feldman's testimony were perjured, that the Government knew or should have known of the perjury, and that the perjured testimony substantially influenced the grand jury's decision to indict.

**PROCEDURAL BACKGROUND**

On March 25, 2009, the Defendant was charged in a one-count Indictment [DE 1] with knowingly using a Capital One Visa credit card with the intent to defraud, in violation of 18 U.S.C. § 1029(a)(2). On April 6, the Defendant pleaded not guilty. On May 21, the Defendant filed a Motion to Suppress [DE 18], seeking to exclude certain evidence found in a police search of the residence where he was staying. The Court held an evidentiary hearing on July 2 and denied the Motion to Suppress in a December 7, 2009, Opinion and Order [DE 46]. The instant Motion was filed on February 5, and became fully briefed when the Defendant filed his Reply [DE 60] on March 12. On March 18, the Court held a Telephone Status Conference [DE 62], during which the Government and the Defendant advised the Court that neither wished to present further evidence on this matter by way of an evidentiary hearing. The Motion is therefore ripe

for ruling.

## LEGAL STANDARD

As a general rule, a district court does not have any supervisory authority over a grand jury or its proceedings. *United States v. Williams*, 504 U.S. 36 (1992). However, district courts do possess supervisory authority in the grand jury arena regarding "a violation of laws or procedural rules." *United States v. Gillespie*, 974 F.2d 796 (7th Cir. 1992). For the purposes of asserting this oversight, "[t]he Government's knowing use of false testimony violates due process." *United States v. Burke*, 425 F.3d 400, 413 (7th Cir. 2005).

Claims that the Government proffered perjured testimony to a grand jury are evaluated under the prosecutorial misconduct standard. *See id.* For an indictment to be dismissed because of false testimony presented to the grand jury, a defendant must show prejudice amounting to either "proof that the grand jury's decision to indict was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008) (internal citations omitted).

## FACTUAL BACKGROUND

In its December 7, 2009, Opinion and Order, the Court made the following findings of fact:

At all times relevant, Jonathan Feldman rented a residence (in the form of a converted silo located in a grainery), in Linn Grove, Indiana, located in Adams County, Indiana, from the residence's owner, Todd Fichtler. Feldman had a verbal lease agreement with Fichtler, paying $100.00 per month plus utilities. Feldman was also responsible for maintaining the yard.

Sometime in late May, 2008, one of Feldman's acquaintances brought Delmas Sexton to Feldman's residence to do some laundry because Sexton had recently become homeless. The next day, Sexton returned to the residence and asked if he could move in. Feldman and Sexton worked out an arrangement whereby Sexton could live at the residence if he paid half of the rent and assumed yard maintenance duties. While it was Feldman's understanding that the arrangement was temporary, there was no definite term of lease, nor was there a definite termination date. While living at the residence, Sexton slept in the living room on the sofa, and shared a closet with Feldman. Excepting Feldman's bedroom, Sexton enjoyed full use of the residence.

On July 11, 2008, Feldman contacted the Adams County Sheriff Department because he wanted to have Sexton removed from the residence. At that point, Sexton had been living there for approximately forty days. Feldman met that day with Deputy Sheriff Larry Harv Butler and told Butler that the reason he wanted Sexton removed was that Sexton had been obtaining false names and credit cards. That night, Butler called Feldman and told him that the police could assist in having Sexton removed that night. At 11:58 p.m., Butler arrived at Feldman's residence with State Trooper Brian Walker, Deputy Sheriff Pat Piper, and Monroe Town Reserve Deputy Alexander Burtch. At least three of the four officers were in uniform, and all were armed. Sexton was in the residence at the time, and Feldman was across the street at a neighbor's house, observing from the front deck.

Upon arrival, Butler knocked on the door and did not receive an answer. Butler peered through an open window and saw Sexton sitting at a computer. He knocked a little harder, and Sexton answered the door. Butler identified himself and explained to Sexton that Feldman did

not want Sexton at the residence any longer, and that Sexton "needed to get his things and leave." (Tr. at 40, 72). Sexton was given no choice in the matter, but was told that he had to vacate the premises immediately. Butler described Sexton as being very cooperative and compliant throughout the duration of the encounter. Butler asked Sexton for identification, and Sexton provided Butler with a driver's license and credit card. The credit card was in the name of Colton Goodman. Sexton told Butler that Goodman was a friend of his. Butler tried to contact Goodman but was unable to.

Sexton then began packing his belongings into a duffel bag. As he packed, Walker saw two credit cards in names other than Sexton's fall out of a folder that Sexton was handling. Walker picked up the credit cards and handed them to Butler. Prior to Sexton leaving, Butler asked if he had everything, to which Sexton replied in the affirmative. Butler asked Sexton specifically whether the computer was his, and Sexton responded that the computer belonged to Feldman. Sexton then left on foot.

Shortly after Sexton left the residence, Feldman appeared. Feldman asked if the officers had found all of the incriminating credit cards, and the officers replied that they had found three. At that point, Feldman indicated that there might be more credit cards in the trash, located in a burn pile behind the residence. Walker accompanied Feldman back to the burn pile, retrieved a large black trash bag, and brought it back inside the residence. Butler was still in the residence when Walker and Feldman returned with the garbage bag. One of the men then began digging through the bag.

The officers found a white CVS bag inside the garbage bag, which contained a Capital One credit card ending in the numbers 4023, some ATM withdrawal receipts from Markle Bank

4

and a welcome letter, all associated with the Capital One credit card. The bag also contained some drug paraphernalia , as well as legal papers, computer packaging, and garbage. Nothing in the garbage bag belonged to Feldman. Before departing the residence, the officers asked Feldman whether he was the owner of the computer. Feldman replied that the computer belonged to Sexton (12/7/09 Opinon and Order, DE 46).

Given the Court's findings, the Defendant now alleges that Feldman told four material lies when testifying before the grand jury. This section will outline the alleged falsehoods.

**A.     Agreement with Sexton for Lease of the Apartment**

On the issue of a living arrangement between Feldman and the Defendant, Feldman testified to the grand jury as follows:

Q:      How long had Mr. Sexton been staying with you at that location, approximately?

A.      Probably about 40 days or so.

. . . .

Q:      Was there some arrangement made for Mr. Sexton to stay at your residence?

A:      There was no arrangement made. He just kind of showed up. Bobby brought him over. They went back and he had a trailer that he stayed at and I guess the trailer was destroyed. And then he didn't have a place to go.

(Grand Jury Tr. 3).

Regarding the issue of rent, Feldman testified to the following:

Q:      Did you agree to have Mr. Sexton stay with you and pay rent, half the rent?

A:      No. If he had a job, he would, but there was no way to pay rent. He didn't have a job at

that time.

(Grand Jury Tr. 4).

However, at the suppression hearing, United States Postal Inspector Andrew Gottfried testified to the following on direct examination:

Q: Alright. And the last line of this paragraph states that Mr. Feldman agreed to have Mr. Sexton stay with him in order to pay half of the rent; is that correct?

A: Yes, that is my summary statement of—

Q: And that is what Mr. Feldman told you?

A: Yes, I believe this was a telephonic conversation I had with Mr. Feldman.

(Suppression Hr'g Tr. 141).


**B.** **Location of Recovered Credit Card**

Regarding the location of a garbage bag during a police searched, Feldman testified as follow to the grand jury:

Q: Do you know what type of credit card it was?

A: Yes. It was a Citibank card because I think—yeah. It was found in the garbage after [Sexton] left.

Q: Now you say "found in the garbage." Was this the same day he was removed?

A: Uh huh...

Q: Let me first get to the garbage.

A: The garbage was outside.

Q: Of your residence?

A: Yes, outside the door on the carport. It hadn't been taken to the garbage dumpster yet.

Q: How did the police get to the garbage?

A: Well, that night—how did the police get to it? I told them.

The Defendant notes that this Court has already made a finding of fact that the garbage bag was found in a burn pile behind the residence. The Defendant further avers that there was no garbage dumpster at all on the premises, and that all trash was taken to the burn pile.

**C. Removing Information from the Computer**

In regard to whether the Defendant was at the computer when evicted from the residence, Feldman testified:

Q: Did the police ask you about the computer?

A: Yes. Yeah, they did. Well, I told them in my report to them about the computer how he obtained it. He bought it from—using this credit card, a $6,000 computer system and I told the police about this computer system. And when they went there to get him and have him removed, he was on the computer the policeman told me, and he was trying to get rid of information.

(Grand Jury Tr. 12).

However, at the Suppression Hearing, Officer Larry Butler testified to the following:

Q: Alright. Did you tell Feldman that, when you went to remove Mr. Sexton from the property, he was trying to erase data or take data off the computer?

A: No sir.

Q: In fact, did you ever see—do you know what he was doing at the computer?

A: It appeared that he was chatting on a chat line.

(Suppression Hr'g Tr. 32).

D. **Trips to the Bank**

Regarding the number of times Feldman accompanied the Defendant to the bank, he testified as follows:

Q: Did you appear in any of the photographs?

A: Yes I did. I was in one of them because he picked me up, went to the bank in the car and that was when I started figuring out quite everything. I was in there once when he picked me up. No you don't have it.

Q: One of the photographs that you did review?

A: Yes I am in there and you can see both of us.

. . . .

Q: And on that particular occasion, there was a stop to which bank?

A: The Markle Bank in Bluffton right on the way. I bank there too. I bank with Markle Bank and his credit card happened to be with Markle Bank where he could do withdrawals through Markle Bank with CitiBank Visa.

(Grand Jury Tr. 13–14).

However, it is undisputed that testimony during the Suppression Hearing revealed that Feldman was with the Defendant at the bank on at least two occasions.

**ANALYSIS**

For the Court to dismiss the Defendant's Indictment, it must find that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it. The Defendant contends that each of the alleged falsehoods substantially influenced the grand jury's decision to indict. He also cautions the Court not to take a "myopic" view of each part of the testimony, but rather to consider the testimony in aggregate.

For reasons discussed more fully below, the Court finds that individually and collectively, the allegedly perjurious statements constituted a mere fraction of the evidence on which the grand jury would have based its determination. Therefore the Court does not have "grave doubt" that the decision to indict was substantially influenced by these four pieces of testimony, and the Motion to Dismiss Indictment will be denied.[1]

In this Section, the Court will first note some of the incriminating evidence before the grand jury that may have led it to issue the Indictment. The Court will then analyze Feldman's inconsistent statements in that context.

**A.     Incriminating Evidence Before the Grand Jury**

In considering whether to indict the Defendant for the crime charged, the grand jury heard testimony that the Defendant had admitted that the credit card was in the name of a prison friend's father. The grand jury learned about an incident that took place between the Defendant

---

[1] Because the Court finds that Feldman's statements could not have substantially influenced the grand jury's decision to indict *even if* perjurious, it does not reach a factual or legal determination as to whether Feldman committed perjury during his grand jury testimony.

and a Citibank representative wherein the Defendant falsely identified himself and provided the representative with a phony identification. Further, the grand jury heard testimony regarding instances of the Defendant shopping online with the credit card. Finally, the grand jury heard eyewitness testimony that the Defendant had withdrawn money from an ATM using a fraudulently obtained debit card. The Defendant does not allege in his Motion that any of this testimony was perjured or otherwise invalid.

B. **The Individual Statements**

Taken individually, the Court does not find that any of the allegedly false statements are material to the indictment for the Defendant's credit card fraud, let alone substantially influential. The first alleged instance of perjury regards the rental agreement between Feldman and the Defendant. If it were true that Feldman lied about the monthly rent arrangement, this does not bear on whether the Defendant committed credit card fraud. The issue is wholly tangential to the Indictment and is not directly relevant toward any element of the charged crime. The second piece of testimony concerns whether the credit card at issue was found in a dumpster, or a burn pile behind the house. This issue, too, has little or no relevance to whether there was reason for the grand jury to believe that the Defendant committed the crime of credit card fraud. It is inconceivable that the location of the credit card's discovery would influence the grand jury as to whether the Defendant obtained and used it illegally.

The third alleged act of perjury, regarding whether the Defendant was trying to remove information from his computer when he encountered the police, is arguably more relevant toward the charged crime of fraud. However, the crime charged in the Indictment involves only

behavior relating to the Defendant using a credit card to obtain goods in excess of $1,000.00. The Defendant contends that this alleged lie was prejudicial as "an attempt by Feldman to entice the grand jury into believing that Sexton was guilty of identity theft and other crimes." (Mot. to Dismiss Indictment 9). However, the question of whether the Defendant was trying to erase information from the computer at the time of his eviction does not relate to the crimes for which he was accused, which all allegedly took place before the eviction. The Court does not have grave doubt that the grand jury was substantially influenced by this testimony.

The final alleged act of perjury is that Feldman told the grand jury that he appeared in only one photograph taken at a bank with the Defendant. In fact, he appeared in two or more photographs. The Defendant argues that "Feldman's lie tends to minimize Feldman's own participation in the crime and at the same time provide a compelling basis for confirming Sexton as the sole wrong-doer." What the Defendant fails to explain is how Feldman's involvement or non-involvement changes the calculus of whether the Defendant committed the alleged crimes. The Defendant does not contend that Feldman lied about *the Defendant*'s involvement in the alleged crimes, only his own. As mentioned before, the grand jury heard testimony that the Defendant, independently of Feldman, withdrew money and bought goods and merchandise with fraudulently obtained cards. Therefore, this testimony could not have substantially influenced the grand jury as to the Defendant's commission of the charged crime.

### C.     The Statements in Aggregate

In his reply brief, the Defendant seems to tacitly concede that none of the individual statements would have been enough to substantially influence the grand jury's decision to indict.

However he contends that "[w]hen the lies are looked at in relation to and as a part of his entire testimony, it is patently obvious that the four lies were meant to and in fact had a prejudicial effect on the grand jury." [Rep. Brief 1]. The Defendant contends that all of the lies were told in concert for the purpose of distancing Feldman from the Defendant. For example, he contends that the lie about the rent was told to make the relationship seem more distant than that of a landlord and a tenant, and the lie about the location of the credit card was told to make the discovery of the credit card seem less related to Feldman's property. The Defendant contends that without the perjured statements, the grand jury would have found that Feldman had greater involvement in the alleged crimes, and the Defendant would not have been charged.

However, the prejudice that the Defendant alleges as a result of these aggregated statements does not approach a level that would give the Court grave doubt that the grand jury was substantially influenced by them. As previously stated, the Defendant's culpability was at issue, not Feldman's. If it was indeed Feldman's scheme to tell a series of immaterial lies for the purpose of creating an impression that he was an innocent observer, this fact will bear on his credibility as a witness and his innocence or guilt in subsequent proceedings. However, the record of evidence that was before the grand jury included eyewitness testimony from several witnesses (some of whom were police officers) that directly implicates the Defendant in the alleged crime. Comparing the minor and immaterial statements to which the Defendant objects to the overwhelming amount of evidence against the Defendant, the Court has no doubt that the grand jury was not substantially influenced by the statements and can not dismiss the Indictment on these grounds.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss Indictment [DE 52] is DENIED.

So ORDERED on March 26, 2010.

                                              s/ Theresa L. Springmann
                                              THERESA L. SPRINGMANN
                                              UNITED STATES DISTRICT COURT